**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| ROBERT MAYFIELD; and R.U.M. ENTERPRISES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF LABOR and MARTIN WALSH, in his official capacity as U.S. Secretary of Labor, <br><br> Defendants. | Case No. 1:22-cv -00792 <br><br> **COMPLAINT** |

**INTRODUCTION**

1. The Constitution vests Congress alone with the power to make law and prohibits Congress from giving away its lawmaking power to the Executive Branch. Nonetheless, the Secretary of Labor claims broad, discretionary lawmaking power to impose and freely modify salary-level requirements for executive (*i.e.*, management) employees who are expressly *exempt* from the Fair Labor Standards Act's general rule that employees must be paid on an hourly basis.

2. The Secretary asserts that Congress gave him this power when it authorized him to "define[] and delimit[]" the scope of the Act's exemption for management employees. 29 U.S.C. § 213(a)(1). But contrary to the Secretary's interpretation, the statutory text denies any power to mandate salary levels. Properly construed, the statute authorizes the Secretary only to clarify the *duties* that executive, administrative, or professional ("EAP") employees must perform to be classified as exempt from hourly wage requirements. Any other interpretation of the

statute would violate the separation of powers because Congress cannot give the Secretary an unbridled power to decide what salaries employers should pay their exempt employees.

3. Nonetheless, the Secretary has repeatedly raised salary-level requirements for EAP employees. Most recently, in 2019, the Department of Labor finalized a regulation raising its salary level requirement by 50 percent. These actions violate the Constitution because the Department is imposing conditions on the exemption that Congress never contemplated. And if it the statute does authorize the Department to decide what salaries employers must pay EAP employees, the statute violates the non-delegation doctrine because there is no intelligible principle governing the Department's exercise of discretion in deciding where to draw the line.

4. These arbitrary rules wreak havoc on small-business owners. Here, Plaintiff Robert Mayfield has been forced to make a Hobson's choice with every new rule requiring a salary level increase: He must either make difficult restructuring decisions that will hurt some of his managers by making them ineligible for bonuses, or he must pay higher salaries knowing that this will reduce bonuses available to his management team. *See* Exhibit A, Declaration of Robert Mayfield, ¶¶ 15−30 (Mayfield Decl.).

5. Simply put, the Department's regulation takes away flexibility for R.U.M. Enterprises, Inc. to implement Mayfield's ideal compensation structure, which the company was forced to abandon when DOL raised its salary level requirements. *Id*. ¶¶ 22−24, 29−30. While R.U.M. would ideally start management

employees at lower base salaries, these managers would stand to earn significantly more in bonuses if not for the Department's heightened salary level mandate because their bonuses are tied to company profits—meaning that they have a stake in the success of the business and are affected to the extent the Department imposes heightened costs. *Id.* ¶¶ 27, 29–30.

6. Therefore, in raising the salary requirement from $455 to $684 per week, the Department has interfered with Robert Mayfield's freedom to run his business as he deems fit and his employees' freedom to work on terms of their own choosing.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to 28 U.S.C § 1331 and 5 U.S.C. §§ 702, 706.

8. The Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C §§ 2201 and 2202, 28 U.S.C. § 1361, and to vacate unlawful agency action under 5 U.S.C. § 706.

9. Venue is proper under 28 U.S.C § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district. Venue is also proper under 28 U.S.C § 1391(e)(1)(B) because the defendants are officers, employees, and agencies of the United States and a substantial part of the events or omissions giving rise to the claims occurred in this district. *See also* 5 U.S.C. § 703 (venue for actions under the Administrative Procedure Act generally proper in "a court of competent jurisdiction").

## PARTIES

10. Plaintiff R.U.M. Enterprises, Inc. is incorporated as a C-Corp in the State of Texas. Exhibit A, Mayfield Decl. ¶ 3. The company operates thirteen high-performing Dairy Queen franchises and a Wally's Burger Express in Austin, Texas, and in surrounding localities. *Id.* ¶ 4.

11. Plaintiff Robert Mayfield, a resident of Austin, Texas, is the sole shareholder and owner of R.U.M. Enterprises, Inc. *Id.* ¶ 3. Mayfield took over his family business in 1979 and has spent the past forty-three years working tirelessly to expand his operations in pursuit of his entrepreneurial dreams. *Id.* ¶¶ 2, 4.

12. Mayfield wishes to foster an entrepreneurial philosophy that rewards R.U.M.'s management team for their success. *Id.* ¶ 5. For this reason, he wants to maintain flexibility for his company to set compensation structures that make sense for his business model, and in his locale. *Id.*

13. Mayfield has good relations with his employees because he shows he values their contributions. *Id.* ¶ 6. For starters, R.U.M. pays most entry level employees $15 per hour—well above state and federal minimum wage. *Id.* ¶ 7. And later, if employees are elevated to the management team, they receive both competitive salaries and opportunities to earn bonuses tied to store profits. *Id.* ¶ 10−11. In other words, Mayfield rewards high performance by letting his managers share in the company's success.

14. Defendant, the U.S. Department of Labor (Department or DOL), is an agency of the United States government, under the direction and control of the U.S.

4

Secretary of Labor. The Department enforces its $684 per week salary level requirement through its Wage and Hour Division.

15. Defendant Martin Walsh is the U.S. Secretary of Labor. He is sued in his official capacity.

## GENERAL ALLEGATIONS

### *The Fair Labor Standards Act, the EAP Exemption, and the Secretary's Improper Assumption of Legislative Power*

16. The Fair Labor Standards Act ("Act") expressly requires employers to pay non-exempt employees an hourly wage of at least $7.25 per hour. 29 U.S.C. § 206. Employers must also pay non-exempt employees 1.5 times their base hourly wage for all time worked beyond 40 hours in a workweek. 29 U.S.C. § 207. This requires employers to keep meticulous records of all time worked for non-exempt employees. 29 C.F.R. § 516.1. But while Congress set a default rule requiring hourly pay, Congress also provided numerous exemptions in 29 U.S.C. § 213. And those "exemptions are as much a part of the FLSA's purpose as the overtime-pay requirement." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018).

17. At issue in this case, Section 213(a)(1) provides that hourly pay and overtime rules "shall not" apply to "any employee employed in a bona fide executive, administrative, or professional capacity . . . ." This is commonly referred to as the "EAP Exemption."

18. Congress did not define the terms "bona fide executive, administrative, or professional capacity . . ." Instead, Congress delegated power to the Secretary of Labor to "define[] and delimit[]" these terms. *Id*.

5

19. But the Secretary of Labor has construed the statute as conferring far more power than Congress ever delegated. Specifically, the Secretary construes the delegated power to "define[] and delimit[]" the scope of the EAP Exemption as an elastic authority that could justify any employment conditions that the Secretary deems appropriate for exempt employees.

20. The Secretary has assumed authority to condition the EAP Exemption on a requirement that EAP employees be paid a salary level of at least $684 per week.

21. Congress explicitly established minimum compensation requirements for various types of employees in other provisions of the Act. For example, Congress was explicit in setting salary level requirements for exempt baseball players in 29 U.S.C. § 213(a)(19).

22. But Congress denied the Secretary power to decide what salaries employers must pay executive employees.

23. Even the DOL has, at times, acknowledged that the Department is imposing salary level requirements "without specific Congressional authorization." Exhibit B, Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 81 Fed. Reg. 32,391, 32,431 (May 23, 2016) (2016 Rule). Nonetheless, the Department has consistently justified its salary level requirement as a screening mechanism to guard against the misclassification of employees who are not likely performing executive, administrative, or professional duties—even while acknowledging that it is excluding

many workers employed in a bona fide executive, administrative, or professional capacity from the EAP Exemption. *Id.* at 32,402.

24. The Department has persisted in imposing salary level requirements even though it has acknowledged that "the laudable goal of reducing misclassification cannot overtake the statutory text, which grounds [the] analysis of [EAP] exemption status in the 'capacity' in which someone is employed—*i.e.*, the employees' duties." Exhibit C, Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 84 Fed. Reg. 51,230, 51,231, 51,244 (2019 Rule).

### *Without Statutory Direction, the Department of Labor Oscillates Between Different Methodologies for Setting its Salary Level Requirement*

25. The Secretary has operated without any statutory direction in imposing and raising salary level requirements for the EAP Exemption. As a result, the Department has dramatically changed its methodology in setting salary level requirements, depending on the political priorities of different administrations.

26. Because the Department has historically justified its salary level requirements as a screening mechanism to guard against the misclassification of employees who are not likely performing executive, administrative, or professional duties, the Department typically begins by compiling data on the salaries of employees performing bona fide executive, administrative, or professional duties. *Id*. The Department then promulgates regulations imposing a salary level requirement that would allow most employees performing EAP duties to remain classified as exempt; however, by design this methodology excludes a certain percentage of

7

workers "employed in a bona fide executive, administrative, or professional capacity" from the EAP Exemption.

27.     The number of affected workers varies depending on what methodology the Department chooses. For example, whereas DOL's salary level regulation had historically excluded no more than 10 percent of otherwise exempt employees, the Department chose to draw the line at the 20th percentile in 2004 when raising the salary level requirement from $155 per week for executive and administrative employees (and from $170 per week for professionals) to $455 per week for all EAP employees. *See* Exhibit D, Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22,122, 22,123, 22,167 (Apr. 23, 2004) (2004 Rule). By the Department's estimates this heightened salary level requirement would have excluded an estimated 6.7 million workers who would otherwise qualify for the EAP Exemption unless given raises. *Id.* at 22,123.

28.     The Department changed its methodology again in 2016 when finalizing a rule to exclude 40 percent of executive, administrative, or professional employees who would otherwise qualify for the EAP Exemption. *See* Exhibit B, 2016 Rule, 81 Fed. Reg. at 32,391 (May 23, 2016). Using this methodology, the Department sought to raise its salary level requirements from $455 to $1,036 per week—*i.e.*, from $23,660 to $53,872 annually. *Id.* at 32,393. By the Department's estimates this would have excluded an estimated 4.2 million workers who would otherwise qualify for the EAP Exemption in 2017. *Id.*

*The Department of Labor Raises its Salary Level Requirement by 50 Percent*

29.     The Department's 2016 Rule never went into effect because a federal judge in the Eastern District of Texas issued a preliminary injunction. *See* Exhibit E, *Nevada v. U.S. Department of Labor*, 4:16-cv-00731 ALM, Doc. No. 60 (Nov. 22, 2016).

30.     Thereafter, in 2019, the Department finalized a new rule imposing the now-applicable salary level requirement at issue in this lawsuit. Exhibit C, 2019 Rule, 84 Fed. Reg. 51,230. The 2019 Rule officially withdrew the 2016 Rule. *Id*. at 51,235. At the same time the 2019 Rule raised the minimum salary requirement for EAP employees by 50 percent—from $455 to $684 per week—*i.e.*, from $23,660 to $35,568 annually. *Id*. at 51,231.

31.     In setting the minimum salary requirement at $684 per week, the Department chose to depart from the methodology that it had used when promulgating the 2016 Rule. *Id*. Instead, the Department exercised presumed discretion to return to the methodology used in promulgating the 2004 Rule—*i.e.*, denying the EAP Exemption for 20 percent of employees performing EAP duties.

32.     The Department acknowledged this new salary threshold would compel employers to either give salary raises to 1.2 million workers who perform EAP duties, or to pay them on an hourly basis going forward. *Id*. at 51,231. In other words, even if performing exempt EAP duties, the Department deemed these employees ineligible for the EAP Exemption.

33.     The 2019 Rule revised the salary level requirement set forth in 29 C.F.R. § 541.600, effective on January 1, 2020. *Id*. at 51,234.

### *The Department of Labor Exercises Unguided Discretion*
### *in Declining Requests to Lessen the Impact of the 2019 Rule*

34. Without guidelines or direction in statutory text, the Department rejected requests from various commentators that would have lessened the impact of the 2019 Rule for employers like R.U.M. Enterprises, Inc.

35. Of significance to R.U.M., without guidelines or direction from Congress, the DOL declined numerous requests to allow employers greater flexibility to satisfy Department's salary level requirement with bonuses and other forms of incentive pay. *See* Exhibit F, Comment Letter of Council for Christian Colleges & Universities; Exhibit G, Comment Letter of U.S. Chamber of Commerce; Exhibit H, Comment Letter of U.S. SBA Office of Advocacy; Exhibit I, National Golf Course Owners Association, Club Management Association of America, Golf Course Superintendents Association of America and the National Club Association; Exhibit J, Comment Letter of Home Care Association of America.

36. Additionally, without guidelines or direction in the statutory text, the Department declined requests from commentators to minimize the impact of the 2019 Rule in other ways. For example, the Department declined requests to delay the implementation date; to phase in heightened salary level requirements over a longer period; to adopt a different methodology that would allow for a lower salary level (or lower salary levels), accounting for economic disparities between different regions or localities, and; to allow more lenient rules for certain sectors, industries, non-profits or for smaller entities. *See* Exhibit K, Comment Letter of Matthew Paxton; Exhibit L, Comment Letter of the National Association of Counties; Exhibit M, Comment

Letter of the National Small Business Association; Exhibit N, Comment Letter of National Federation of Independent Business; Exhibit O, Comment Letter of Easterseals; Exhibit P, Comment Letter of The Corps Network; Exhibit Q, Comment Letter of Community Options, Inc.; Exhibit R, Comment Letter of the National Newspaper Association; Exhibit S, Anonymous Comment Letter; Exhibit T, National Council of Young Men's Christian Associations of the U.S.A. ("YMCA Letter").

### *Injury to the Plaintiffs*

37. R.U.M. employs roughly 350 individuals, many of whom are full-time. The company has a valued management team with a director of operations, three district managers, a general manager for each location, and assistant managers who are each responsible for directing subordinate employees. Exhibit A, Mayfield Decl. ¶¶ 6, 8. These management employees all perform executive duties. *Id.* ¶ 8. They are all paid on a salary basis. *Id.* And they are paid a salary level consistent with DOL regulations. *Id.*

38. Additionally, to incentivize high performance, R.U.M. awards bonuses to managers, which are tied to the company's profits. *Id.* ¶ 11, 27. This gives managers a stake in the success of the business. *Id.* But the Department's rigid salary level requirements impede R.U.M. from implementing its preferred compensation structure and therein reduces both company profits and management bonuses. *Id.* ¶¶ 29–30.

39. Maintaining flexibility in developing compensation structures is important for R.U.M. given the competitive nature of the fast-food industry. For this

reason, Robert Mayfield has consistently opposed the Secretary's decisions imposing and raising salary level requirements for executive employees. *E.g.*, Exhibit U, Comment Letter of Robert Mayfield (Sept. 3, 2015) ("2015 Comment Letter"); Exhibit V, Comment Letter of Robert Mayfield (Apr. 11, 2019). In the alternative, Mayfield has asked the Department to establish a minimum salary requirement consistent with labor market standards in the Austin area to allow his company the flexibility to implement compensation structures that make sense for his business, and that optimally incentivize his management team to succeed. *See* Exhibit D, 2004 Rule, 69 Fed. Reg. at 22,164 ("An owner of four Dairy Queen stores in Austin, Texas . . . asks the Department to lower the minimum salary level [from a proposal of $425 per week] to $400 per week because supervisor salaries in the area start at $21,000 per year.").

40. The Department has repeatedly injured R.U.M. in raising its salary level requirements with the 2004 Rule, the 2016 Rule, and now with the 2019 Rule. *See* Exhibit A, Mayfield Decl. ¶¶ 16−30.

41. As a result of the 2019 Rule, R.U.M was required to either pay higher starting salaries to all managers earning less $684 per week or to convert them to a non-exempt status. *Id.* ¶ 22−24. And R.U.M. is prohibited from counting more than 10 percent of the non-discretionary bonuses paid to its managers toward the Department's salary level requirement.

42. To ensure compliance, the company chose to increase salaries for affected managers because the company wants to continue to cultivate a "managerial mindset" that would be lost if managers were treated as non-exempt employees and

because Mayfield was concerned managers would feel they have been demoted if converted to an hourly status. *Id.* ¶¶ 5, 31–33. But this affects the companies' profits and consequently the bonuses paid to its management team. *Id.* ¶ 27.

43. Not only was R.U.M. forced to give raises to its lowest paid assistant managers, but this, in turn, compelled the company to give salary increases to others on its management team because the company feared it would create morale issues to give significant salary increases to its least qualified managers without giving commensurate raises to more deserving managers. *Id.* ¶¶ 24–25.

44. As a result of the 2019 Overtime Rule, R.U.M. expended over $200,000 in base salaries for its assistant managers, above what it would have been paying those employees. *Id.* ¶ 26.

45. But for the Department's heightened salary level requirement, R.U.M. would start assistant managers at less than $684 per week ($35,568 annually). *Id.* ¶ 29. For example, the company would start at least some assistant managers at or below $519–$576 per week ($27,000–$30,000 annually). And if R.U.M. was permitted to implement this change it would allow the company to turn higher profits, which would likewise mean higher bonuses for its management team. *Id.* ¶ 30.

46. Also, as a result of the 2019 Rule, R.U.M is unable to give management opportunities to employees, whom the company might wish to cultivate into leadership roles if their labor is not currently worth $684 per week. *Id.* ¶ 28. In practice, this means that the company must sometimes wait longer to promote employees who show potential for leadership roles. *Id.*

47. Additionally, Robert Mayfield is concerned about the likelihood that the DOL will exacerbate his company's present injuries because the Department has plans to further increase salary level requirements for EAP employees. *Id*. ¶¶ 31–33. *See* Exhibit W, Semiannual Agenda of Regulations, 87 Fed. Reg. 48,308 (Aug. 8, 2022). If the Department dramatically raises its salary level requirement, R.U.M will be compelled to convert some employees on its management team from exempt to non-exempt status, or to make other difficult restructuring decisions to maintain operations.

## COUNT I

**THE SECRETARY OF LABOR EXCEEDED STATUTORY AUTHORITY IN PROMULGATING 29 C.F.R. § 541.600 TO IMPOSE A SALARY LEVEL REQUIREMENT OF $684 PER WEEK**

**(VIOLATION OF 29 U.S.C. § 213 AND 5 U.S.C. § 706(2)(A) AND (C))**

48. The preceding paragraphs are incorporated herein by reference.

49. The APA requires this Court to hold unlawful and set aside any agency action that exceeds statutory authority. 5 U.S.C.§ 706(2).

50. In enacting and amending the FLSA, Congress decided upon a fundamental policy that the minimum value of labor is $7.25 per hour for non-exempt employees. And further, Congress decided upon a policy of requiring employers to pay time-and-a-half for all hours that a non-exempt employee works beyond 40 hours in a workweek. At the same time, Congress decided to exempt "all employees employed in a bona fide executive, administrative, or professional capacity[.]" 29 U.S.C. § 213(a)(1).

51. Nothing in the FLSA defines the terms "bona fide executive, administrative, or professional capacity[.]" But the terms "bona fide executive, administrative, or professional capacity" have objective meaning.

52. Working in a "bona fide executive, administrative, or professional capacity" means to be performing the function of an executive, administrative, or professional employee with reference to one's duties and responsibilities.

53. Nothing in Section 213(a)(1), or any other provision of the Act, grants or implies an authority for the Department to prohibit an employer from classifying an employee performing bona fide executive duties as exempt from the FLSA's default hourly pay requirements.

54. In finalizing the 2019 Rule, the DOL revised 29 C.F.R. § 541.600 to raise the Department's salary level requirement for executive, administrative, and professional employees from $455 to $684 per week.

55. In doing so, the DOL admitted that it would exclude 20 percent of individuals previously eligible for the EAP Exemption (affecting an estimated 1.2 million EAP employees), unless employers should respond by providing higher salaries to conform with the Department's revised standard. See Exhibit C, 84 Fed. Reg. at 51,231.

56. The Department's salary level requirement—or at least its current formulation, requiring employers to pay $684 per week—exceeds Department's powers to define and delimit the EAP exemption.

## COUNT II

## THE SECRETARY OF LABOR'S PROMULGATED REGULATION MANDATING SALARY LEVEL REQUIREMENTS WAS AN UNCONSTITUTIONAL EXERCISE OF LEGISLATIVE POWER

## (VIOLATION OF THE NONDELEGATION DOCTRINE U.S. CONST. ART. I, § 1 AND 5 U.S.C. § 706(2)(A) AND (C))

57. The preceding paragraphs are incorporated herein by reference.

58. The APA requires this Court to hold unlawful and set aside any agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C.§ 706(2).

59. Article I, section 1 of the U.S. Constitution states: "All legislative powers herein granted shall be vested in a Congress of the United States." Often referred to as the "Legislative Vesting Clause," this provision provides one of the cornerstones of the Constitution's separation of powers by ensuring that Congress, and Congress alone, makes the law.

60. Accordingly, Congress may not delegate its lawmaking power to other branches of government, particularly to the Executive Branch. Otherwise, the same branch of government that enforces the law would possess the power to make the law.

61. When passing a law, therefore, Congress must make the fundamental policy decisions with which the law is concerned and leave to the Executive Branch only the job of filling in less consequential details or applying the law to a given set of facts. In other words, Congress must provide a sufficiently intelligible governing principle.

62. The authority to "define[] and delimit[]" the EAP Exemption provides no intelligible principle governing whether or under what conditions the Secretary of Labor should impose a salary level requirement. No other provision of the Act provides a governing intelligible principle.

63. The authority to "define[] and delimit[]" the EAP Exemption provides no intelligible principle governing the Secretary of Labor's exercise of discretion in deciding how high to set a salary level requirement. No other provision of the Act provides a governing intelligible principle.

64. The authority to "define[] and delimit[]" the EAP Exemption provides no intelligible principle guiding or cabining the Secretary of Labor's exercise of discretion in deciding whether and to what extent to allow employers to count bonuses and other forms of incentive pay toward satisfying the Department's salary level requirement. No other provision of the Act provides a governing intelligible principle.

65. The authority to "define[] and delimit[]" the EAP Exemption provides no intelligible principle guiding or cabining the Secretary of Labor's exercise of discretion in deciding whether to impose a uniform, nation-wide salary level, or under what conditions the Secretary should adopt different salary level requirements within different states, regions, localities, or in the U.S. territories. No other provision of the Act provides a governing intelligible principle.

66. The authority to "define[] and delimit[]" the EAP Exemption provides no intelligible principle guiding or cabining the Secretary of Labor's exercise of

17

discretion in deciding whether to impose uniform salary level requirements for executive, administrative, and professional employees, or what conditions should justify different salary level requirements for executive, administrative, and professional employees. No other provision of the Act provides a governing intelligible principle.

67. The authority to "define[] and delimit[]" the EAP Exemption provides no intelligible principle guiding or cabining the Secretary of Labor's exercise of discretion in deciding whether to impose uniform salary level requirements across industry lines, or what conditions should justify different minimum salary requirements for different industries, sectors, or business-size classifications. No other provision of the Act provides a governing intelligible principle.

68. The authority to "define[] and delimit[]" the EAP Exemption provides no intelligible principle guiding or cabining the Secretary of Labor's exercise of discretion in deciding when to modify salary level requirements or whether to gradually adjust the Department's salary level requirements over a period of years when making modifications. And no other provision of the Act provides a governing intelligible principle.

69. If Section 213(a)(1) is construed as authorizing the Secretary of Labor to exercise the legislative power to establish a salary level requirement for EAP employees, any DOL regulation imposing a salary level requirement must be set aside as unlawful.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for relief as follows:

1. A judgment declaring that 29 C.F.R. § 541.600 is unlawful and/or unconstitutional;

2. An injunction prohibiting the Defendants from enforcing 29 C.F.R. § 541.600 against the Plaintiffs;

3. An order setting aside and vacating 29 C.F.R. § 541.600 as unlawful agency action under 5 U.S.C. § 706.

4. An award of reasonable attorney fees and costs, pursuant to 28 U.S.C. § 412, or any other applicable authority; and

5. Any other relief the Court deems just and proper.

DATED: August 9, 2022.

        Respectfully submitted,

        s/ Erin Wilcox_____
        ERIN WILCOX (Cal. Bar No. 337427)
        LUKE A. WAKE (Cal. Bar No. 264647*)
        **PACIFIC LEGAL FOUNDATION**
        555 Capitol Mall, Suite 1290
        Sacramento, California 95814
        Telephone: (916) 419-7111
        Facsimile: (916) 419-7747
        Email: EWilcox@pacificlegal.org
        Email: LWake@pacificlegal.org

        *Pro hac vice application forthcoming

        ***Attorneys for Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Western District of Texas by using the appellate CM/ECF system.

I certify that service will be accomplished by CERTIFIED MAIL with Return Receipt Requested to:

Ms. Stephanie Rico
Office of the United States Attorney
for the Western District of Texas
601 N.W. Loop 410, Suite 600
San Antonio, Texas 78216-5597

and

Mr. Merrick Garland
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Ave. N.W.
Washington, D.C. 20530

            _____/s Erin Wilcox_____
            ERIN WILCOX