## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

ROBERT MAYFIELD; and
R.U.M. ENTERPRISES, INC.,

                 Plaintiffs,

v.

U.S. DEPARTMENT OF LABOR and
MARTIN WALSH, in his official capacity
as U.S. Secretary of Labor,

                 Defendants.

Case No. 1:22-cv-00792-RP

**ORAL HEARING REQUESTED**

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

LUKE A. WAKE*
ERIN WILCOX (Cal. Bar No. 337427)
**PACIFIC LEGAL FOUNDATION**
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
Email: LWake@pacificlegal.org
Email: EWilcox@pacificlegal.org
*Admitted pro hac vice*

JOHN KERKHOFF*
**PACIFIC LEGAL FOUNDATION**
3100 Clarendon Boulevard, Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881
Facsimile: (916) 419-7747
Email: JKerkhoff@pacificlegal.org
*Admitted pro hac vice*

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page(s)**

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ............................................. 1

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION .................................................................................................... 1

BACKGROUND AND STATEMENT OF FACTS ................................................... 2

I.      The Fair Labor Standards Act ........................................................................ 2

        A.      The FLSA's Enumerated List of Exemptions .................................... 3

        B.      The EAP Exemption ........................................................................... 4

II.     The Department of Labor's Salary Level Rule ............................................. 5

III.    Mayfield Files This Lawsuit ......................................................................... 9

STANDARD OF REVIEW ...................................................................................... 9

ARGUMENT ........................................................................................................ 10

I.      The Department Lacks Statutory Authority for the Final Rule ................... 10

        A.      The Final Rule Violates the FLSA in Excluding Over a Million
                Executive, Administrative or Professional Employees ..................... 12

                1.      FLSA's Text Confirms the Department Lacks Authority To
                        Exclude EAP Employees from the Exemption ...................... 12

                2.      The FLSA's Structure Signals that the EAP Exemption Is Not
                        Conditioned on Salary Level Requirements .......................... 15

                3.      Federalism Principles Require a Narrow Construction To
                        Preserve Freedom of Contract .............................................. 17

                4.      To Avoid Non-Delegation Concerns, The Court Should Narrowly
                        Construe the Power to Define and Delimit. .......................... 18

                        a.      The Department's Construction Should be Rejected
                                Because It Raises Serious Non-Delegation Concerns ..... 18

                        b.      The Court Can Avoid a Non-Delegation Issue by Applying
                                the Major Questions Doctrine .................................. 20

        B.      The FLSA's Declaration of Policy Does Not Confer Authority ............ 23

i

II.     Section 213(a)(1) Violates the Non-Delegation Doctrine................................. 23

        A.      Congress Must Provide a Governing Standard To Limit and Channel
                the Exercise of Discretion ....................................................................... 23

        B.      No Intelligible Principle Governs the Exercise of Discretion Under the
                Department's Construction of Section 213............................................ 24

                1.      This Case Is Indistinguishable from *Panama Refining*.............. 24

                2.      The Department Cannot Rely on the FLSA's Remedial Goals.. 28

        CONCLUSION......................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Addison v. Holly Hill Fruit Products, Inc.*, 322 U.S. 607 (1944)............. 13, 15, 19, 27

*ALA Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) .................. 22, 28

*Buckner v. Armour & Co.*, 53 F. Supp. 1022 (N.D. Tex. 1942).................................. 21

*Caha v. United States*, 152 U.S. 211 (1894)............................................................... 23

*Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984) ................................................ 14

*Churchill Forge, Inc. v. Brown*, 61 S.W.3d 368 (Tex. 2001) ...................................... 17

*Crowell v. Benson*, 285 U.S. 22 (1932) ...................................................................... 18

*Devoe v. Atlanta Paper Co.*, 40 F. Supp. 284 (N.D. Ga. 1941)................................... 21

*Encino Motorcars v. Navarro*, 138 S.Ct. 1134 (2018) .......................................... 23, 28

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) .................................................................. 17

*Gundy v. United States*,
   139 S.Ct. 2116 (2019) ............................................................................................. 29

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*,
   448 U.S. (1980) ........................................................................................................ 28

*INS v. Phinpathya*, 464 U.S. 183 (1984) .................................................................... 14

*Jama v. Immigration and Customs Enforcement*, 543 U.S. 335 (2005) .................... 16

*Jarkesy v. Sec. & Exch. Comm'n*, 34 F.4th 446 (5th Cir. 2022) .............. 11, 23–24, 29

*King v. Burwell*, 135 S.Ct. 2480 (2015)....................................................................... 20

*Mistretta v. United States*, 488 U.S. 361 (1989) ......................................................... 26

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety &
   Health Admin.*, 142 S.Ct. 661 (2022)..................................................................... 20

*Nevada v. U.S. Dep't of Labor*,
   218 F.Supp.3d 520 (E.D. Tex. 2016) (*Nevada I*).............................................*passim*

*Nevada v. U.S. Dep't of Labor*,
   275 F.Supp.3d 795 (E.D. Tex. 2017) (*Nevada II*) .................................. 13

*Opp Cotton Mills v. Adm'r of Wage & Hour Div. of Dep't of Lab.*,
   312 U.S. 126 (1941) ......................................................................... 3, 22

*Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935)...........................................*passim*

*Philadelphia Indem. Ins. Co. v. White*, 490 S.W.3d 468 (Tex. 2016) ........................ 17

*Rodriguez v. United States*, 480 U.S. 522 (1987)....................................................... 27

*Salinas v. United States*, 522 U.S. 52 (1997).............................................................. 17

*Small v. United States*, 544 U.S. 385 (2005)............................................................... 15

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers*,
   531 U.S. 159 (2001) ............................................................................... 18

*Texas v. United States*, 497 F.3d 491 (5th Cir. 2007)................................................. 21

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015)................................................. 15

*United States Forest Service v. Cowpasture River Preservation Ass'n*,
   140 S.Ct. 1837 (2020) ............................................................................ 18

*United States v. United Verde Copper Co.*, 196 U.S. 207 (1905)........................ 19, 25

*Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302 (2014).................................................. 18

*Wayman v. Southard*, 23 U.S. (10 Wheat) 1 (1825)................................................... 23

*West Virginia v. EPA*, 142 S.Ct. 2587 (2022)............................................................. 20

*Whitman v. Am. Trucking Associations*, 531 U.S. 457 (2001)............................. 18, 24

*Wirtz v. Miss. Publishers Corp.*, 364 F.2d 603 (5th Cir. 1966)................................. 14

## **Statutes**

5 U.S.C. § 706(2)(A) ...................................................................................... 9

5 U.S.C. § 706(2)(B) ...................................................................................... 9

28 U.S.C. § 2201............................................................................................. 9

29 U.S.C. § 202................................................................................................ 3, 23

29 U.S.C. § 203(m)(2)(A) ................................................................................. 16

29 U.S.C. § 206 .................................................................................................. 3

29 U.S.C. § 206(a) ........................................................................................... 16

29 U.S.C. § 207 .................................................................................................. 3

29 U.S.C. § 207(i)(1) ....................................................................................... 16

29 U.S.C. § 207(a)(1) ...................................................................................... 16

29 U.S.C. § 213 .......................................................................................... 2–3, 24

29 U.S.C. § 213(a)(1) ............................................................................... *passim*

29 U.S.C. § 213(a)(5) ...................................................................................... 15

29 U.S.C. § 213(a)(17) .................................................................................... 16

29 U.S.C. § 213(a)(19) .................................................................................... 15

29 U.S.C. § 213(b)(24) .................................................................................... 16

Tex. Labor Code Ann. § 62.153 ...................................................................... 17

**Feeral Regulations**

29 C.F.R. Part 541, Subpart B .......................................................................... 9

29 C.F.R. § 541.600 ..................................................................................... 5, 17

29 C.F.R. § 541.602 .......................................................................................... 5

**Federal Rule of Court**

Fed. R. Civ. P. 56(a) ......................................................................................... 9

**Miscellaneous**

Andrias Kate, *An American Approach to Social Democracy:*
   *The Forgotten Promise of the Fair Labor Standards Act,*
   128 Yale L.J. 616 (2019) .......................................................................... 22

Defining and Delimiting the Exemptions for Executive,
   Administrative, Professional, Outside Sales and Computer
   Employees, 69 Fed. Reg. 22,122 (Apr. 23, 2004) ................................... 5, 7

Defining and Delimiting the Exemptions for Executive,
    Administrative, Professional, Outside Sales and Computer
    Employees, 81 Fed. Reg. 32,391 (May 23, 2016) ..................................... 5, 7, 8, 10

Defining and Delimiting the Exemptions for Executive,
    Administrative, Professional, Outside Sales and Computer
    Employees, 84 Fed. Reg. 51,230 (Sept. 27, 2019)................... 2, 5–8, 14, 19, 21, 27

Defining and Delimiting the Exemptions for Executive,
    Administrative, Professional, Outside Sales and Computer
    Employees, RIN 1235-AA39, Office of Information and Regulatory
    Affairs, Office of Management and Budget,
    https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202210
    &RIN=1235-AA39 (forecasting a notice of proposed rulemaking in
    May 2023) ............................................................................................................. 8

Oxford English Dictionary (1st ed. 1933) ........................................................ 12–13

## INTRODUCTION

Robert Mayfield has grit. He believes in hard work, and he's lived it. He has built his family company up from just four Dairy Queen locations in 1979 to 13 franchises and a Wally's Burger Express. Exhibit A., Decl. of Robert Mayfield, Doc. No. 1-3 ¶ 4. The company, R.U.M. Enterprises, Inc., employs roughly 350 individuals in the Austin area. *Id.* ¶ 6. These employees are the lifeblood of Mayfield's business. And he rewards them handsomely for their hard work with a starting wage of $15 per hour. *Id.* ¶ 7. But recent Department of Labor regulation prevent Mayfield from compensating his management team the way he would like. *Id.* ¶¶ 29–30. Under these regulations, Mayfield must pay managers a salary dictated by the Department ($684 per week). *Id.* ¶ 21. This inflexible mandate prevents the company from paying as high of bonuses as it would otherwise. *Id.* ¶¶ 21, 29–30.

But Congress did not authorize salary level regulation for management employees. The Fair Labor Standards Act simply exempts "any employee employed in a bona fide executive, administrative, and professional capacity" from the default rule that employees must be paid an hourly wage. 29 U.S.C. § 213(a)(1) ("EAP Exemption"). Nothing suggests that Congress gave the Department a power to dictate salary levels for these exempt employees. On the contrary, the Act's text and structure confirm that the EAP Exemption applies to *all* employees performing "executive, administrative, and professional" duties—regardless of salary levels.

Yet, the Department asserts that it can set salary levels for 47.6 million exempt workers because a parenthetical, nestled within Section 213, allows the agency to

"define[] and delimit[]" several statutory terms unrelated to payment levels.[1] *See* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 84 Fed. Reg. 51,230, 51,258 (Sept. 27, 2019) (Final Rule) (estimating white-collar workers nationwide). The Department's elastic construction is unwieldy. Not only does it conflict with the plain meaning of the text and the canons of construction, but it raises serious constitutional problems.

Section 213's "define and delimit" language allows the Department to clarify the *nature of the work* that exempts an employee from hourly pay requirements. But if this empowers the Secretary to dictate salary level requirements, it violates the nondelegation doctrine because the statute provides *no direction* as to whether (or how) the Secretary should develop salary level rules. Under the Department's construction, the delegation to "define and delimit" is every bit as capacious—and unconstitutional—as the National Recovery Act's delegation allowing the President to prohibit transport of commodities as he deemed fit. *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935). Accordingly, this Court must either reject the Secretary's broad construction or hold that Section 213(a)(1) violates separation of powers.

## BACKGROUND AND STATEMENT OF FACTS

### I.    The Fair Labor Standards Act

Congress enacted the Fair Labor Standards Act (FLSA) in 1938 to establish baseline wage and hour standards governing most employees. The aspirational goal

---

[1] For ease of the reader, Plaintiffs will omit the brackets hereafter and will refer to the Secretary's power to "define and delimit" relevant terms.

was to "correct and … eliminate" the "existence … of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health efficiency, and general well-being of workers." 29 U.S.C. § 202. To that end, the FLSA requires that most employees be paid on an hourly basis. But, recognizing that some jobs and occupations are not conducive to an hourly pay structure, Congress also exempted certain employees from the general rule.

The statute lists exempt employees who may be paid on a salary basis. Non-exempt employees, on the other hand, must be paid at least $7.25 per hour.[2] 29 U.S.C. § 206. The FLSA requires meticulous time records for non-exempt employees in part because they are entitled to time-and-a-half their base hourly wage for all time worked after 40 hours in a week. 29 U.S.C. § 207. Those time-keeping requirements do not apply to exempt employees. 29 U.S.C. § 213.

A.      **The FLSA's Enumerated List of Exemptions**

The statute defines its 19 exemptions by the nature or function of the work performed. For example, Section 213(a)(5) exempts "any employee employed in the catching … cultivating, or farming of any kind of fish." And Section 213(a)(8) exempts "any employee employed in connection with the publication of [a local] … newspaper with a circulation of less than 4,000." Likewise, Section 213(a)(1) provides exemption for "any employee employed in the capacity of an academic administrative personnel

---

[2] The original enactment established a universal minimum wage of 30 cents per hour for non-exempt employees; however, Congress also proscribed a procedure—requiring conditional fact finding and consideration of specific factors—for developing industry-specific wage orders "not in excess of 40 cents an hour…." *Opp Cotton Mills v. Adm'r of Wage & Hour Div. of Dep't of Lab.*, 312 U.S. 126, 136–37 (1941).

or teacher in elementary or secondary schools," and anyone working "in the capacity of an outside salesman." Thus, the exemptions share a common theme: they cover trades, occupations, and professions.

Congress imposed conditions on several exemptions. For example, employees working for "organized camp[s]" are exempt, only so long as the employer does not "provid[e] services or facilities … in a national park." *Id.* at 213(a)(3). Likewise, the exemption for those "employed in agriculture" requires the employee to satisfy at least one of five conditions. *E.g.*, *id.* at 213(a)(6) (allowing the exemption if the employee is a family member). And the exemption applicable to baseball players requires that they be paid "not less than a weekly salary equal to the minimum wage [they would be paid] … for a workweek of 40 hours, irrespective of the number of hours the employee devotes to baseball related activities." *Id.* at 213(a)(19).

## B.     The EAP Exemption

The "EAP Exemption"—relevant here—applies to "any employee employed in a bona fide executive, administrative, or professional capacity (including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools), or in the capacity of outside salesman." Section 213(a)(1). The FLSA does not define what it means to be employed in a "bona fide executive, administrative, or professional capacity." Instead, it provides that the Secretary of Labor may "define and delimit" those terms, as well as other terms (*e.g.*, "outside salesman") used in Section 213(a)(1). *Id.*

## II.     The Department of Labor's Salary Level Rule

The Department has "defined and delimited" the EAP Exemption through regulations that require three things. First, the employee must perform primarily executive, administrative, or professional duties. 29 C.F.R. §§ 541.100–541.304. Second, the employee must be paid on a salary basis. 29 C.F.R. §§ 541.600, 541.602. And third, the employee must be paid a salary level of at least **$684 per week ($35,568 annually).** 29 C.F.R. § 541.600.

The Department has used its narrow authority far more expansively than Congress intended. To begin, the Department has periodically raised its salary level requirements. Until the Final Rule became effective in 2020, 84 Fed. Reg. at 51,234, the Department had required only that employers pay executive, administrative or professional (EAP) employees $455 per week ($23,660 annually).[3] The Department attempted to raise its salary level requirement by over *100 percent* to $1,036 per week ($53,972 annually) in 2016.[4] But a federal court ruled that the Department lacked authority and enjoined the rule. *Nevada v. U.S. Dep't of Labor*, 218 F.Supp.3d 520 (E.D. Tex. 2016) (*Nevada I*). In 2020, therefore, the Department rescinded the 2016 Rule. Final Rule, 84 Fed. Reg. at 51,235. At the same time, the Department raised its salary requirements by *50 percent* from the standard established in 2004. *Id*.

---

[3] Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22,122, 22,123 (Apr. 23, 2004) ("2004 Rule").

[4] Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 81 Fed. Reg. 32,391 (May 23, 2016) ("2016 Rule").

The Department claims that its salary level rules screen out employees who are not likely performing EAP duties. *Id*. at 51,237. But in imposing salary level conditions on the EAP Exemption, the Department acknowledges that it excludes a certain percentage of employees who are performing EAP duties. For example, in 2019, the Department estimated that the Final Rule would exclude 1.2 million workers who might otherwise qualify for the EAP Exemption. *Id*. at 51,231.

What's more, over the years, the Department's salary level rules have changed arbitrarily. At times the Department has set different salary level rules for "executive" employees than for "administrative or professional" employees. Final Rule at 51,254. At other times the Department has set different rules for "executive" and "administrative" employees than for "professional[s]." *Id*. But since 2004 the Department has imposed uniform rules for all EAP employees. *Id*.

Likewise, the Department has used varying methodologies in setting salary level rules. At times the Department has looked to aggregated salary data in low wage regions and industries, or from small establishments. *Id*. at 51,236 (discussing the 1958 Rule). At other times the Department has adjusted salary requirements with reference to increases in the Consumer Price Index. *Id*. (discussing the 1975 Rule). In developing the Final Rule, the Department looked to salary survey data from the South and in the retail industry nationally. *Id*. at 51,238.

More significantly, the Department has changed its methodology when working with these data sets. For example, in 1958 the Department's lowest permissible salary was set so that only "10 percent of workers performing EAP duties

in the lowest-wage regions and industries" would be excluded. *Id*. at 51,236. By contrast, in 2004 the Department changed its methodology to set the salary level at the 20th percentile, looking at salary data from the South and the retail industry. *Id*.[5] And in 2016 the Department sought to more than double the then-applicable salary level rule by adopting yet another methodology—this time setting the salary level at the 40th percentile of salaries earned in the South. *Id*. at 51,237.

In the Final Rule, the Department returned to the methodology used in the 2004 Rule. *Id*. at 51,235–36 (establishing the salary level rule at the 20th percentile in the South and in the retail industry). This change was predicated on the Department's judgment that the 2016 Rule had "untethered the salary level test from its historic justification…" *Id*. at 51,242. In rejecting the 40th percentile methodology, the Department explained that "the laudable goal of reducing misclassification cannot overtake the statutory text, which grounds analysis of [EAP] exemption status in the 'capacity' in which someone is employed—i.e., the employees' duties." *Id*. at 51,231, 51,244. Still, in raising its salary level rule to $684 per week, the Department

---

[5] Until 2004 employers were required to use either a short- or long-form duties test to determine whether an employee was working in the capacity of an executive, administrative, or professional employee. Final Rule 84 Fed. Reg. at 51,236. The short-form test was comparatively easier to apply, but less comprehensive. For this reason, the Department required employers to pay *different* minimum salaries depending on whether they used the short- or long-form test. But the 2004 Rule eliminated the short- and long-form test in favor of a "standard" test. *Id*. In turn, the Department established a single salary level rule with a new methodology. *Id*.

estimated that the Final Rule would exclude 1.2 million workers who may perform EAP duties from the Exemption.[6] *Id*. at 51,231.

Further, the Department has also used the EAP Exemption to make other significant decisions. For example, after prohibiting the practice for years, the 2016 Rule allowed employers to satisfy up to 10 percent of the salary level requirement with predetermined bonuses or commissions. *Id*. at 51,247. Likewise, the Final Rule allows employers to count incentive payments for up to 10 percent of the $684 per week requirement. *Id*. at 51,248. The Final Rule allows employers more flexibility as to the timing of bonuses than the 2016 Rule; however, the Department declined requests to allow still greater flexibility for employers to satisfy heightened salary requirements with proportionally greater bonuses. *Id*. at 51,247–48.

Finally, the Department has exercised its assumed discretion in other ways. For example, the Department has declined requests to adopt regional salary level rules to better account for economic disparities across the country. *Id*. at 51,239. And the Department has declined to adopt more lenient rules for certain sectors, industries, nonprofit organizations, and for small entities, even as the agency has established special (heightened) salary level rules for the motion picture industry. *Id*. at 51,239.

---

[6] The Department is working on a rule that would further raise salary requirements. *See* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, RIN 1235-AA39, Office of Information and Regulatory Affairs, Office of Management and Budget, https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202210&RIN=1235-AA39 (forecasting a notice of proposed rulemaking in May 2023).

### III.   Mayfield Files This Lawsuit

Mayfield has consistently opposed the Department's salary level regulations because these rules take away earning opportunities from his most deserving employees. Decl. of Robert Mayfield, ¶ 14. He wants to enable his exempt management team to earn greater bonuses, which are tied to store profits. *Id*. ¶¶ 11, 27, 30. But in requiring his company to pay higher base salaries for exempt assistant managers performing "executive" duties, the Final Rule reduces company profits and available bonuses.[7] *Id*. ¶ 27. Accordingly, his company would change compensation structures if the Final Rule was vacated. *Id*. ¶ 29.

### STANDARD OF REVIEW

Under the Administrative Procedure Act a court must set aside and vacate agency action if it is not in accordance with law, 5 U.S.C. § 706(2)(A), or contrary to any constitutional right, power, privilege, or immunity, *id*. § 706(2)(B). Plaintiffs must show that the Department lacked authority for the Final Rule, or that 29 U.S.C. § 213(a)(1) violates the Constitution. The Court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[8] Plaintiffs are entitled to declaratory relief to clarify their rights to the extent there is a justiciable controversy. 28 U.S. Code § 2201.

---

[7] Mayfield's managers and assistant managers are "executive" employees under the Department's regulations. *See* 29 C.F.R. Part 541, Subpart B.

[8] There is no dispute as to any material fact. The parties agree that this case can be decided based on the administrative record. *See* Joint Stipulation Regarding Proposed Schedule for Further Proceedings, Document 13, ¶¶ 2–6 (Oct. 28, 2022).

## ARGUMENT

**I.    The Department Lacks Statutory Authority for the Final Rule**

The Department has acknowledged that it imposes its salary level rules "without specific Congressional authorization." 2016 Rule, 81 Fed. Reg. at 32,431. Nonetheless, the Department believes it was unnecessary for Congress to give explicit statutory authority because Section 213(a)(1) confers a power to "define and delimit" the scope of the EAP Exemption at the discretion of the Secretary. This Court should reject the Department's elastic view of the Secretary's delegated powers or rule that Section 213(a)(1) unconstitutionally delegates lawmaking powers.

First, by its plain text, the statute does not confer a salary level rulemaking power. The authority to "define and delimit" the terms "bona fide executive, administrative, or professional capacity" is simply an authorization to clarify the nature or function of the work one must perform to qualify for the EAP Exemption. As the Eastern District of Texas affirmed, the plain language requires a paramount focus on the duties that the employee performs—not a focus on the salary levels. *Nevada I*, 218 F.Supp.3d 520, 529 ("Congress defined the EAP exemption with regard to duties, which does not include a minimum salary level."). And the structure of the Act, as well as the canons of construction, confirms that if Congress had wanted to impose salary level requirements it would have said so explicitly—just as Congress explicitly dictated compensation requirements elsewhere.

Second, it is improper to assume that the "define and delimit" power can be expanded to dictate salary level determinations affecting 47.6 million employees

without a clear statement authorizing such regulation. Respect for federalism counsels for a narrowing construction. Likewise, the major questions doctrine presumes that Congress would not leave such a major policy determination to the Executive Branch without clear direction. *Id.* at 531 n.5 (suggesting the major questions doctrine should apply in review of the Department's salary level rules).

Third, it would violate the non-delegation doctrine to grant the Secretary an open-ended power to dictate whatever salary requirements he deems fit. Under the Department's construction, the statute fails to proscribe any criteria governing the exercise of discretion—which is not surprising since, as noted above, the "define and delimit" authority has nothing to do with payment levels. The FLSA does not require the Secretary to use any specific methodology or to make any findings of fact. Nor does the text provide any guidance for how the Secretary should go about setting salary level rules, or whether the Secretary should enforce salary level rules at all. Such unbridled discretion is the hallmark of a non-delegation violation. *See Jarkesy v. Sec. & Exch. Comm'n*, 34 F.4th 446, 462–63 (5th Cir. 2022) ("If the intelligible principle standard means anything, it must mean that a total absence of guidance is impermissible under the Constitution."). Accordingly, to avoid a constitutional problem, this Court should narrowly construe the Secretary's "define and delimit" power.

A.     **The Final Rule Violates the FLSA in Excluding Over a Million Executive, Administrative, or Professional Employees**

1.     **FLSA's Text Confirms the Department Lacks Authority To Exclude EAP Employees from the Exemption**

The FLSA confers exempt status on "***any*** employee employed in a bona fide executive, administrative, or professional capacity." Section 213(a)(1) (emphasis added). The terms "executive, administrative [and] professional" "relate to a person's performance, conduct, or function without suggesting salary." *Nevada I*, 218 F.Supp.3d at 529. "The Oxford English Dictionary defines 'executive' as someone '[c]apable of performance; operative … [a]ctive in execution, energetic … [a]pt or skillful in execution.'" *Id*. (quoting Oxford Dictionary, 1933 Edition). "'Administrative' is defined as '[p]ertaining to, or dealing with, the conduct or management of affairs; executive.'" *Id*. "[A]nd the dictionary defines 'professional' as "[p]ertaining to, proper to, or connected with a or one's profession or calling … [e]ngaged in one of the learned or skilled professions … that follows an occupation as his (or her) profession, life-work, or means of livelihood." *Id*.

Additionally, because capacity refers to being placed in a specific "position, condition, character, or relation," the term "capacity" underscores that Congress focused on the employees' function *Id*. Accordingly, to be employed in the "capacity" of an "executive" means to work in the role of an executive—*i.e.*, to perform executive duties in one's position. And to be employed in the "capacity" of an "administrative or professional" employee means to work in an administrative or professional position.

Likewise, the term "bona fide" emphasizes the focus on the employee's functional duties. "The Oxford English Dictionary defines 'bona fide' as '[i]n good

12

faith, with sincerity; genuinely." *Id*. Accordingly, Congress plainly intended the EAP Exemption to apply to employees who were genuinely performing EAP "tasks" but to deny the Exemption to those who were given a job title without commensurate duties.

What is more, the text provides examples of qualifying EAP employees by referring only to the nature of their work. For one, "any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools" qualifies for the EAP Exemption. 29 U.S.C. § 213(a)(1). Congress opted against creating a special exemption for teaching professionals, but instead chose to clarify that these professionals are performing the right sort of duties to qualify as working in a "bona fide executive, administrative, or professional capacity."

So, duties, not salaries, give life to the EAP Exemption. Yes, the Secretary may "define and delimit" those *duties*, but he cannot impose requirements—like salary levels—foreign to the text. And nothing in the text implies salary level rulemaking power. But even assuming the Department can adopt a salary level test as a screening mechanism to guard against misclassification of employees who are not performing the right duties, the text plainly prohibits any rule that would exclude more than a *de minimis* number of employees performing EAP duties. *See Nevada v. U.S. Dep't of Labor*, 275 F.Supp.3d 795 (E.D. Tex. 2017) ("*Nevada II*") (concluding that the Department lacked authority to impose a salary level rule excluding 40 percent of otherwise qualifying EAP employees). *See also Addison v. Holly Hill Fruit Products, Inc.*, 322 U.S. 607, 614 (1944) (stressing that the Court could not infer authority for the Secretary to expand labor exemptions in the absence of "appropriate language").

The Department points to *Wirtz v. Miss. Publishers Corp.*, 364 F.2d 603 (5th Cir. 1966) as authority. Final Rule, 84 Fed. Reg. at 51,239. But *Wirtz* merely concluded that a weekly salary requirement was not "arbitrary and capricious." *Id.* at 608. That does not speak to whether the Final Rule is precluded by the plain meaning of the statutory text, which is the first step in "reviewing an agency's construction of a statute." *Nevada I*, 218 F.Supp.3d at 528. *See INS v. Phinpathya*, 464 U.S. 183, 189 (1984) (affirming courts look to the plain meaning of undefined words); *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 843 n.9 (1984) (requiring courts to reject interpretations that are precluded when applying "traditional tools of statutory construction"). And further, *Wirtz* did not have occasion to consider the non-delegation and canon of avoidance arguments presented in this case.

In any event, a decision upholding the Department's salary rules as they existed in 1966 has no bearing today because the Department has significantly changed its methodology since then. In the 1960s the Department's rule excluded only those employees with salaries below the 10th percentile in the lowest wage regions and industries, whereas the Final Rule excludes anyone earning less than the 20th percentile of salaries in the South or the retail industry nationally. *Id.* at 51,235–36. The Fifth Circuit has never had occasion to address whether this methodology is consistent with the statute, much less whether it is permissible to exclude as many as **1.2 million** otherwise qualifying EAP employees.

> **2.     The FLSA's Structure Signals that the EAP Exemption Is Not Conditioned on Salary Level Requirements**

Section 213's structure confirms that Congress did not contemplate salary level rules. First, Congress consistently defined the exemptions with reference to workers employed in specific trades, occupations, or in certain types of employment. *E.g.*, 29 U.S.C. § 213(a)(5) (fisherman exemption); 29 U.S.C. § 213(a)(19) (baseball exemption). *See Addison*, 322 U.S. at 617 (emphasizing that Congress "dealt with exemptions in detail and with particularity, enumerating [them] … based on different industries, on different occupations … on size and on areas [of production]."). This pattern confirms a paramount focus on the nature of the work.

Second, Congress knew how to include a salary level when it wanted—and it conspicuously omitted salary language from the EAP Exemption. In contrast, Section 213(a)(19) says baseball players must be paid a salary level equal or greater than what they would be earning if working "40 hours" a week at "minimum wage." The fact that Congress unequivocally imposed a salary level requirement for the baseball player exemption but not in the EAP Exemption demonstrates that Congress did not intend to impose salary level requirements on EAP employees. *See Addison*, 322 U.S. 607 (holding that the Department had abused its discretion in "defin[ing] and delimit[ing]" the scope of an exemption: "Where Congress wanted to make [an] exemption depend on size [of the business], as it did in two or three instances not here relevant, it did so by appropriate language."). *See also Small v. United States*, 544 U.S. 385, 398 (2005) (Thomas, J., dissenting) (explaining that "Congress' explicit use of [language] in other provisions shows that is specifies such restrictions when it

wants to do so."). As such, the Department's construction conflicts with the canon *expressio unius est exclusio alterius*. *See Texas v. United States*, 809 F.3d 134, 182 (5th Cir. 2015), *as revised* (Nov. 25, 2015) ("to express or include one thing implies the exclusion of the other, or of the alternative.") (citing Black's Law Dictionary 701 (10th ed.2014)).

Third, Congress was explicit in imposing other compensation requirements throughout the rest of the FLSA. In those instances, unlike here, Congress determined the major policy question. Therefore, the Secretary cannot 'discover' the same authority for himself in the "define and delimit" authority. For example, when Congress wanted a minimum wage, it said so in express terms. *See* 29 U.S.C. § 206(a) (requiring that non-exempt employees must be paid at least "$7.25 an hour"). And elsewhere, when Congress wanted to regulate compensation, the statute imposed clear requirements to pay employees based on formulas that left nothing to the discretion of either the employer or the Department.[9] Accordingly, it makes no sense to infer a roving power for the Secretary to dictate salary level requirements for EAP employees without a clear statement and meaningful direction from Congress. *See Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that

---

[9] *E.g.*, 29 U.S.C. § 207(a)(1) (setting overtime rates for non-exempt employees); 29 U.S.C. § 203(m)(2)(A) (establishing a lower hourly wage for tipped employees); 29 U.S.C. § 207(i)(1) (setting formula compensating retail employees); 29 U.S.C. § 213(a)(17) (exempting software engineers who earn at least $27.63 per hour); 29 U.S.C. § 213(b)(24) (exempting employees at certain nonprofits who "are together compensated, on a cash basis, at an annual rate of not less than $10,000").

it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").

### 3. Federalism Principles Require a Narrow Construction To Preserve Freedom of Contract

The federalism canon presumes that Congress does not intend to "alter" state law rules unless Congress says so in "unmistakably clear" terms. *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Thus, when facing competing "plausible interpretations" of a statute, "the proper course [is] to adopt a construction" that preserves state law. *Salinas v. United States*, 522 U.S. 52, 59 (1997). Here, the Department's "define and delimit" authority must be read narrowly.

The employer-employee relationship is traditionally governed by state law.[10] With enactment of the FLSA Congress chose to displace state law that would otherwise allow employers to pay non-exempt employees less than the federally prescribed minimum wage and overtime requirements. But Congress made no clear decision to displace state law concerning compensation level requirements for exempt EAP employees. The Department's cited authority is nebulous at best. Accordingly,

---

[10] Texas exempts employees from hourly pay requirements if they are "employed in a bona fide executive, administrative, or professional capacity." Tex. Labor Code Ann. § 62.153. But the Texas Labor Code confers no authority on the Texas Workforce Commission to "define[] and delimit[]" these terms. And Texas has no corollary regulation to 29 C.F.R. § 541.600, imposing salary level rules. As such, freedom of contract is the default rule if the Department's salary level rules are invalid. *See Philadelphia Indem. Ins. Co. v. White*, 490 S.W.3d 468, 490 (Tex. 2016) (affirming freedom of contract, unless prohibited by a regulatory statute). *See also Churchill Forge, Inc. v. Brown*, 61 S.W.3d 368, 370 (Tex. 2001) ("[C]ompetent parties in Texas shall have the utmost liberty of contracting.") (internal quotations omitted).

respect for federalism requires a narrowing construction to preserve Mayfield's right to run his business as he deems fit on this issue, consistent with Texas law. *See United States Forest Service v. Cowpasture River Preservation Ass'n*, 140 S.Ct. 1837, 1849–50 (2020) (requiring "exceedingly clear language").

> **4.  To Avoid Non-Delegation Concerns, The Court Should Narrowly Construe the Power To Define and Delimit**
>
> **a.  The Department's Construction Should be Rejected Because It Raises Serious Non-Delegation Concerns**

When faced with competing interpretations, federal courts must prefer a plausible reading of a statute that avoids "serious doubt of constitutionality…." *See Crowell v. Benson*, 285 U.S. 22, 62 (1932). For example, in *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 174 (2001), the Supreme Court rejected an agency's interpretation of its jurisdictional powers under the Clean Water Act because there was no "clear statement from Congress" that it intended to confer such expansive jurisdiction that would test the bounds of federalism. Likewise, this Court should reject the Department's expansive interpretation of its power to "define and delimit" the EAP Exemption because it would test the bounds of Congress' power to lawfully delegate rulemaking authority. *Cf. Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014) (directing courts to approach nebulous claims of broad rulemaking power—especially on significant issues—with skepticism).

The non-delegation doctrine requires that Congress must provide an intelligible governing principle to control and guide the exercise of discretion. *See Whitman v. Am. Trucking Associations*, 531 U.S. 457, 458 (2001) (affirming that Congress must establish a standard to which the agency must "conform"). But the

Department construes the "define and delimit" language as conferring a sweeping authority to impose any condition that the Secretary deems fit for the EAP Exemption. Final Rule, 84 Fed. Reg. at 51,239, 51,237 (asserting "broad" rulemaking authority, apparently limited only by the Department's historic practice). This raises the serious specter of violating the non-delegation doctrine because Congress cannot leave it solely to the discretion of Executive Branch officers to decide what the law should require or prohibit. *Panama Refining*, 293 U.S. 388, 415, 421 (ruling that the National Recovery Act violated separation of powers in authorizing the President to prohibit interstate transport of hot oil as he "may see fit" or "think desirable").

Accordingly, this Court should narrowly construe the "define and delimit" power, just as the Supreme Court narrowly construed the Secretary's authority to define and delimit FLSA exemptions in *Addison*. 322 U.S. at 623 (Roberts, J., concurring) (arguing a narrowing construction was necessary to avoid a non-delegation problem). *Addison* concerned the scope of the Secretary's power to define and delimit what was within the "area of production" for an agricultural exemption. *Id.* at 616–17. The Court held that it was improper for the Secretary to infer authority to consider the size of affected businesses when promulgating regulation because Congress had proscribed the exemptions "in such detail[,]" that they could not be construed to allow for "enlargement by implication." *Id.* at 617. In like manner, this Court should reject the Secretary's broad view of its "define and delimit" power under Section 213(a)(1). *See United States v. United Verde Copper Co.*, 196 U.S. 207, 215 (1905) (rejecting an interpretation that would give the Secretary of Interior authority

to "define" critical terms because that would be a "power to abridge or enlarge the statute at will."). *Cf.* Exhibit B, Excerpts from 28th Annual Report of Secretary of Labor (June, 1940), 236 (comparing the Secretary's authority to define and delimit the "area of production" with the Secretary's authority under the EAP Exemption: "Here again the power to define is the power to exclude.").

### b. The Court Can Avoid a Non-Delegation Issue by Applying the Major Questions Doctrine

The major questions doctrine requires courts to reject claims that Congress conferred regulatory authority on subjects of "vast economic and political significance" in the absence of a clear statement. *West Virginia v. EPA*, 142 S.Ct. 2587 (2022); *King v. Burwell*, 135 S.Ct. 2480, 2489 (2015) (stressing that when Congress wants to delegate rulemaking authority on important issues, it does so "expressly"). The doctrine operates as an escape valve to avoid non-delegation problems by giving a limiting construction to an otherwise open-ended delegation on matters of great political significance for which our system expects Congress to speak clearly. In *West Virginia*, the Supreme Court applied the doctrine to reject the Environmental Protection Agency's assertion of an open-ended power to devise any system of emissions regulations that the EPA Administrator might deem "best." Likewise, in *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 142 S.Ct. 661, 665 (2022), the Supreme Court held that a rule affecting millions of employees implicated the major questions doctrine.

Here the Department's claimed authority to establish salary level requirements implicates the major questions doctrine because the setting of

compensation requirements represents a matter of tremendous economic and political concern, potentially affecting up to "47.6 million salaried white collar workers...." Final Rule, 84 Fed. Reg. at 51,258. *See Nevada I*, 218 F.Supp.3d at 530 n.5 (invoking the major questions doctrine in declining to give *Chevron* deference to the Department's construction of the "define and delimit" language). Few things are as politically controversial or of such major economic importance as the establishment or modification of compensation requirements for employees. Proposals to raise minimum wage invariably spark heated political debate. And proposals to raise salary level requirements are just as politicized because of the profound economic impact that such regulatory changes may affect. Accordingly, in the absence of a clear statement from Congress to the contrary, the EAP Exemption should be construed— consistent with our structural separation of powers—as denying the Secretary a controversial power to establish national compensation requirements. *See Devoe v. Atlanta Paper Co.*, 40 F. Supp. 284 (N.D. Ga. 1941) (holding the Department lacked authority to impose salary requirements); *Buckner v. Armour & Co.*, 53 F. Supp. 1022, 1024 (N.D. Tex. 1942) (narrowly construing the "define and delimit" language and signaling that the Department was engaged in "an attempted law making function").

It is especially unlikely that Congress would have delegated such a power without *some* direction as to how the Secretary should go about setting salary level rules. *See Texas v. United States*, 497 F.3d 491, 501 n.6 (5th Cir. 2007) (opining that "courts 'must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political

magnitude to an administrative agency") (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)). For such consequential rules, one would expect Congress would have directed the Secretary to abide by specific procedures, to make findings of fact, and to consider definite factors—just as Congress was explicit in imposing such requirements when authorizing the Department to issue industry-specific minimum wage orders in the FLSA's original enactment. *See Opp Cotton Mills*, 312 U.S. at 136–37 (stressing that Congress had required conditional fact-finding). And, just as when Congress conferred authority to set industry-specific wage orders, one would expect Congress would have established parameters by explicitly establishing both a floor and a ceiling. *Id*. at 136–37, 140 (setting a floor of 30 cents and a ceiling of 40 cents per hour). But the FLSA conspicuously omits any such limitation on the Secretary's asserted power to dictate salary level rules, just as the text is silent as to whether the Secretary should follow specific procedures, weigh specific factors, or make specific factual findings. [11]

---

[11] The FLSA's express delegation allowing industry-specific wage orders was controversial. Even with requirements to abide by specific procedures, to consider explicit factors and to stay within the floor and ceiling that Congress established, opponents raised serious concern that this delegation ran afoul of the Supreme Court's then recent decision in *ALA Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935). *See* Kate Andrias, *An American Approach to Social Democracy: The Forgotten Promise of the Fair Labor Standards Act*, 128 Yale L.J. 616, 666 (2019) ("During legislative debates, conservatives [] emphasized the similarities between FLSA's industry committees and the two major pieces of tripartite New Deal legislation that had been struck down … for violating the nondelegation and due process doctrines.") As such, it is improbable that the 1938 Congress would have authorized the Secretary to dictate salary level requirements without including explicit guardrails to limit and channel the exercise of discretion.

## B.      The FLSA's Declaration of Policy Does Not Confer Authority

As a last redoubt, the Department may argue that the power to "define and delimit" should be construed to allow the Secretary to set salary level rules consistent with the FLSA's declaration of policy. *See* 29 U.S.C. § 202 (pronouncing Congress' goals). But the Supreme Court rejected the argument that the FLSA exemptions should be construed to pursue supposed remedial goals in *Encino Motorcars v. Navarro*, 138 S.Ct. 1134, 1142 (2018). Instead, courts must give the EAP Exemption a "fair" interpretation, without putting a thumb on the scale against employers. *Id*. Accordingly, it is insufficient for the Department to assert—*ipse dixit*—that its construction furthers Congress' goals without something concrete in the operative text authorizing, and giving direction for, salary level rules.

## II.      Section 213(a)(1) Violates the Non-Delegation Doctrine

### A.      Congress Must Provide a Governing Standard To Limit and Channel the Exercise of Discretion

The Constitution prohibits Congress from giving away its lawmaking powers to the Executive Branch. *See Jarkesy*, 34 F.4th 446, 460 (stressing that "accountability evaporates if a person or entity other than Congress exercises legislative power"). As Chief Justice Marshall put it, Congress must decide the "important subjects." *Wayman v. Southard*, 23 U.S. (10 Wheat) 1, 43 (1825). Accordingly, the non-delegation doctrine requires that Congress must resolve fundamental policy issues by providing a governing standard that will enable courts to judge whether the Executive has faithfully executed the law. *E.g.*, *Caha v. United*

*States*, 152 U.S. 210 (1894) (stressing that Congress had decided the important matter). The Supreme Court has distilled this precept by requiring that the statutory text must provide an "intelligible principle" to properly direct the Executive Branch. *See Whitman*, 531 U.S. at 472–73.

The Supreme Court's opinion in *Panama Refining* is instructive. The Court found a provision of the National Recovery Act unconstitutional because it gave unfettered discretion to the President to decide whether and under what conditions to prohibit the transport of hot oil. 293 U.S. at 430. Notwithstanding the general goal of improving American economic conditions, the NRA was unconstitutional because Congress failed to make any policy decision governing this issue. *Id*. at 416– 18. The President was simply free to weigh competing policy considerations as he deemed "fit." *Id*. at 415.

### B.   No Intelligible Principle Governs the Exercise of Discretion Under the Department's Construction of Section 213

#### 1.   This Case Is Indistinguishable from *Panama Refining*

Whether or to what extent employers should be required to pay specific salaries (or to provide other benefits) to EAP employees is "obviously [a question] of legislative policy" that Congress alone can decide. *Panama Refining*, 293 U.S. at 414. *See Jarkesy*, 34 F.4th at 461 (affirming that "[g]overnment actions are 'legislative' if they have 'the purpose and effect of altering the legal rights, duties and relations of persons….'") (quoting *INS v. Chadha*, 462 U.S. 919, 952 (1983)). As such, Section 213(a)(1) can survive only if the statutory text demonstrates that "Congress has declared a policy with respect to that subject…." *Id*. at 415. Yet there is nothing.

Just as in *Panama Refining*, the Court must look first to the provision delegating the power in question. In that case Section 9(c) of the NRA said only that "[t]he President [wa]s authorized to prohibit the transportation" of hot oil. *Id*. Nothing spoke to "whether or in what circumstances or under what conditions the President [was] to prohibit the transportation of [excess oil]…." *Id*. at 415. There was "no criterion to govern the President's course[,]" not even a requirement that the President make "any findings… as a condition of his action." *Id*. Thus, the President maintained total discretion to prohibit transportation of hot oil if he deemed such a prohibition "desirable." *Id*. at 420–21.

As in *Panama Refining*, the FLSA provides no criteria to guide the Secretary's discretion. Nothing within Section 213(a)(1) speaks to whether or under what conditions the Secretary should impose, modify, or withdrawal salary level rules. The text provides only that the Secretary may "define and delimit" in the EAP Exemption in the same unconditioned manner that the NRA authorized President Roosevelt to prohibit transport of hot oil if he deemed "fit." 293 U.S. at 415. *Cf. United Verde Copper Co.*, 196 U.S. 207, 215 (opining that a power to "define" statutory text is a power to "abridge" or "enlarge" the statute and that "[s]uch a power is not regulation: it is legislation").

Not only is Section 213(a)(1) silent as to whether the Secretary should impose salary level rules, but it is also silent as to whether the Secretary should follow any particular methodology *if* he should decide to promulgate salary level rules. For that matter, Congress neglected even to list factors that should weigh into the Secretary's

decision or to require any findings of fact. *Cf. Mistretta v. United States*, 488 U.S. 361 (1989) (suggesting that a list of relevant factors may provide an intelligible principle). And as in *Panama Refining*, nothing in the structure or text of the rest of the statute suggests any governing standard to control the exercise of discretion. 293 U.S. at 416 (searching in vain for some implied constraint to limit the President's discretion).

What is more, the delegation to "define and delimit" the scope of the EAP Exemption is even more problematic than the delegation at issue in *Panama Refining*, which concerned only a binary choice between prohibiting transport of a commodity or not. Under the Department's construction the Secretary maintains unfettered discretion not just over the binary choice of whether to impose a salary level test, but also unfettered discretion as to how to draw the lines when setting such rules. The Secretary is apparently free to decide for himself how high (or low) to set salary level rules based on nothing more than his personal sense of propriety—*i.e.*, his idiosyncratic weighing of competing policy considerations. *See Panama Refining*, 293 U.S. at 415 (observing that the operative text conferred "unlimited authority to determine the policy"); *id*. at 437 (Cardozo, J., dissenting) (acknowledging that the text of the NRA appeared to confer a "privilege of choice between one standard or another … according to an estimate of values that is individual and personal").

And further, in imposing conditions on the EAP Exemption, the Secretary asserts unbridled discretion to make all sorts of subsidiary policy decisions.[12] For

---

[12] For that matter, nothing under the Department's construction prevents the Secretary from conditioning the EAP Exemption on a requirement that employers provide a myriad of benefits or anything else the Secretary might deem fitting.

example, operating without direction, the Secretary has oscillated between imposing different salary level requirements for executive, administrative, and professional employees. Final Rule, 84 Fed. Reg. at 51,254. Likewise, without direction, the Secretary has changed the rules for what sort of payments may count toward satisfying the Department's salary level rules.[13] *Id*. at 51,247.

The Secretary has also operated without direction in deciding whether to impose uniform salary level rules across industries, or to impose distinct rules for different sectors.[14] *Id*. at 51,239. Likewise, without text-based guidance, the Secretary has imposed salary level rules on a nationwide basis, rather than accommodating requests for distinct tests that may better account for geographic disparities between different regions or states. *Id*. In all of this, the Secretary has exercised open-ended discretion to weigh competing policy considerations in crafting salary level rules as he has deemed fit. But the exercise of such discretion in "[d]eciding what competing values will or will not be sacrificed to the achievement of a particular objective …" is "the very essence of legislative choice…." *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987). *See Addison*, 322 U.S. at 623 (Roberts J., concurring) ("If Congress, when it said that the area of production should be defined

---

[13] At times the Secretary has prohibited employers from counting incentive pay. *Id*. at 51,247–48. In contrast, the Secretary currently allows employers to count a very limited amount of incentive pay. *Id*. And in the future the Secretary might decide to allow employers to rely even more on incentive pay. Why? Because nothing in text directs the Secretary as to how (or to what extent) incentive pay should be counted.

[14] In the absence of governing standards the Secretary has exercised discretion to impose special rules for the motion picture industry, *Id*. at 51,239, n.71, but has declined requests to provide selective rules for other industries, for nonprofits, or for small businesses. *Id*. at 51,239.

by the Administrator, meant that that official should have a roving commission to create exemptions from the Act, the entire provision must fall as an unconstitutional attempt to delegate legislative power.").

### 2.   The Department Cannot Rely on the FLSA's Remedial Goals

The Department may claim that the FLSA's statement of policy provides an intelligible standard. But that argument is foreclosed both as a matter of statutory interpretation and under non-delegation case law. First, as explained in Section I(B), *Encino Motorcars* held that the FLSA's exemptions should not be construed as advancing an over-arching remedial goal to the disadvantage of employers. 138 S.Ct. at 1142. Therefore, the Department cannot rely on Section 202's statement of policy as a guiding pole star for its non-delegation defense.

Second, and more fundamentally, *Panama Refining* held that it was improper to assume an intelligible governing principle from the supposed remedial goals of a statute without a firm textual grounding. *Id*. at 293 U.S. at 417–18 (looking to the broad goals of the NRA and finding that there was no "policy" speaking to "the circumstances or conditions in which the transportation of [excess oil] … should be prohibited…"). *See also Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. at 682–84 (1980) (Rehnquist, J., concurring) (observing that the Supreme Court has never relied on a general purpose alone in upholding statutory delegations). Thus, Congress' aspirational goal of improving labor conditions is simply insufficient. That goal provides no more concrete direction than the NRA's general goal of improving economic conditions in the United States. *See Schechter*, 295 U.S. at 538–39 (finding

no intelligible principle in the directive to adopt codes of fair competition that "will tend to effectuate the policy" of the NRA).

Third, this Court is bound by the Fifth Circuit's decision in *Jarkesy*, which held that the Securities and Exchange Act violates the non-delegation doctrine in leaving to the Securities and Exchange Commission the discretion to decide whether, and under what circumstances, to pursue enforcement actions through adjudication or in an Article III Court. 34 F.4th at 459–62. As in *Panama Refining*, the Fifth Circuit "scoured the statute for directives to guide the [agency's] use of that authority, but it found none." *Id.* at 462. That decision affirms that in rare cases where a statute grants the Executive Branch unfettered discretion to decide how it will exercise its powers, the court is duty-bound to hold the statute unconstitutional.

That was true in *Jarkesy* notwithstanding the fact that Congress had declared general legislative goals. As in *Panama Refining*, the problem was that nothing in the operative text "indicat[ed] how the SEC should make [a] call in any given case." *Id.* at 462. And the same is true here. Section 213(a)(1) violates the separation of powers because nothing in the FLSA gives direction for how the Secretary should go about deciding whether or how to impose salary level rules. *See Gundy v. United States*, 139 S.Ct. 2116, 2123 (2019) (Kagan, J., plurality op.) (affirming that "we *would* face a nondelegation question" if the statute "grant[ed] the Attorney General plenary power to determine SORNA's applicability to pre-Act offenders—to require them to register, or not, as she sees fit, and to change her policy for any reason and at any time") (emphasis added).

## CONCLUSION

This Court should grant Plaintiffs' motion for summary judgment because the Department lacks statutory authority to promulgate the Final Rule, or because the Final Rule represents an unlawful exercise of lawmaking powers.

DATED: January 20, 2023.

Respectfully submitted,

LUKE A. WAKE*
ERIN WILCOX (Cal. Bar No. 337427)
**PACIFIC LEGAL FOUNDATION**
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
Email: EWilcox@pacificlegal.org
Email: LWake@pacificlegal.org
*Admitted pro hac vice*

JOHN KERKHOFF*
**PACIFIC LEGAL FOUNDATION**
3100 Clarendon Boulevard, Suite 610,
Arlington, VA 22201
Telephone: (202) 888-6881
Facsimile: (916) 419-7747
Email: JKerkhoff@pacificlegal.org
*Admitted pro hac vice*

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Western District of Texas by using the appellate CM/ECF system.

I certify that service will be accomplished by First Class Mail via the UNITED STATES POSTAL SERVICE to:

BRIAN C. ROSEN-SHAUD
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005

*/s/ Luke A. Wake*
LUKE A. WAKE
